**NORTHROP GRUMMAN CORPORATION,**
Plaintiff,

v.

**THE UNITED STATES, Defendant,**

and

**Raytheon Company, Intervenor.**

**Lockheed Martin Corporation Naval Electronics and Surveillance Systems, Plaintiff,**

v.

**The United States, Defendant,**

and

**Raytheon Company, Intervenor.**

Nos. 00–306C, 00–367C.

United States Court of Federal Claims.

Originally filed Sept. 10, 2001.

Reissued for publication Oct. 4, 2001.

Richard P. Rector, Washington, D.C., attorney of record for plaintiff Northrop Grumman Corporation.

Marcia G. Madsen, Washington, D.C., attorney of record for plaintiff Lockheed Martin Corporation.

Kent G. Huntington, Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Robert E. Kirschman, Assistant Director. Clarence D. Long, Department of the Air Force, of counsel.

Thomas J. Madden, Washington, D.C., counsel for intervenor Raytheon Company.

## *OPINION* [1]

FUTEY, Judge.

These bid protest cases are before the court on the parties' cross-motions for judgment on the administrative record.[2] Plaintiffs Northrop Grumman Corporation (Northrop) and Lockheed Martin Corporation (Lockheed) ask the court for a permanent injunction to halt performance on and to resolicit a contract for the production and installation of airport radar systems entered into by Raytheon Company and the United States government (defendant), acting through its agents the Department of Defense (DOD) and the Federal Aviation Administration (FAA). Plaintiffs allege that two delivery orders recently made by defendant to Raytheon are unlawful because they improperly relax and change contract requirements to an extent that the contract should be subject to new competitive bidding. Plaintiffs base their claim on an assertion that the solicitation as originally competed contained a requirement for "nondevelopmental item" (NDI) radar systems.[3] Plaintiffs contend that this requirement has been violated due to problems with performance of the Raytheon system and that changes made to rectify these problems are outside the scope of the original competition.

Northrop also makes a claim based on misrepresentation, asserting that the delivery orders are unlawful due to Raytheon's material misstatements on its capability of fulfilling the original requirements of the contract, which render the contract award invalid. Lockheed does not bring a claim for misrepresentation and does not join in Northrop's assertions of material misstatements. Defendant and Raytheon counter that the contract contemplated such modification as was needed for an awardee's product to meet the contract requirements, and that there was no requirement in the contract that prohibited modifications to the existing radar system. Raytheon states that it made no misrepresentations concerning its product, and explains that defendant had ample time and access to test it in order to determine its similarity to the radar system described in Raytheon's proposal.

### *Factual Background*

In August 1992, DOD and FAA agreed to engage in a joint procurement of a Digital Airport Surveillance Radar (DASR) for various military and civilian airports around the

---

1. This opinion was originally issued and filed under seal on September 10, 2001. The parties were directed to advise the court regarding any portions of the opinion that should be redacted prior to publication. Defendant and Raytheon submitted redactions while Northrop and Lockheed requested the opinion be published as originally issued. In the court's view, some information is considered confidential and protected. Redactions are indicated by asterisks within brackets ([* * *]).

2. Two cases are addressed in this opinion. Northrop Grumman Corporation's complaint (No. 00–306C) and Lockheed Martin Corporation's complaint (No. 00–367C) were consolidated on June 29, 2000.

3. The term "NDI" is used interchangeably in this opinion as a noun and an adjective.

United States. The purpose of the program was to replace older ASR 7/8 and AN/GPN–12/20/27 air traffic control radar systems in over 110 cities with a state-of-the-art DASR. The program was intended to be executed through the purchase of an NDI DASR. Federal law establishes the preference for the procurement of NDI products. *See* 41 U.S.C. § 264b(b)(1) (1994) (stating agencies "shall ensure that ..., to the maximum extent practicable," they acquire NDI products for governmental needs). This preference stems from the Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, 108 Stat. 3243 (FASA), which was passed to "open the procurement system to private sector goods and services, to simplify the process, and to curtail the purchase of government-unique customized items." [4] Section 52.202–1(e) of the Federal Acquisition Regulations (FAR) defines "Nondevelopmental item":

(1) Any previously developed item of supply used exclusively for governmental purposes by a Federal agency, a State or local government, or a foreign government with which the United States has a mutual defense cooperation agreement;

(2) Any item described in paragraph (e)(1) of this definition that requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency; or

(3) Any item of supply being produced that does not meet the requirements of paragraph (e)(1) or (e)(2) solely because the item is not yet in use.

48 C.F.R. § 52.202–1(e) (2000). "Minor modification" is defined in the FAR as a change that "do[es] not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process." § 52.202–1(c)(3)(ii).[5] In August 1993, a notice appeared in Commerce Business Daily that explained the joint acquisition of the DASR system. The notice stated that DOD and FAA were seeking an NDI system that would need some modification and development to meet specifications. DOD and FAA completed an industry survey to determine feasibility of the NDI strategy. Five companies participated in the survey, including Westinghouse (now Northrop), Raytheon, Siemens Plessey, ITT/Thomson, and Unisys/Alenia. Martin Marietta (now Lockheed) and Marconi declined to participate. Based on this initial research and survey, DOD and FAA believed that at least two companies had NDI DASRs, namely Northrop and Raytheon.[6] The survey team determined that Raytheon's system was a "true NDI system." Nevertheless the survey team found that no existing radar system tested would meet the DASR program's requirements without some modification.

DOD and FAA executed a later agreement that provided the framework for acquisition, configuration, management, and logistics support for the DASR program. The agreement stated the intent to use NDI technology and components to the maximum extent possible. It designated DOD as the lead agency for the procurement. The U.S. Department of the Air Force, Air Force Materiel Command, Electronic Systems Center (Air Force) headed the DOD efforts for the acquisition of the DASR systems. The agreement set out "program management ground rules" for the DASR program. These rules describe the NDI nature of the procurement:

D) Maximum use of NDI is the guiding philosophy for the DASR procurement. To ensure that this philosophy is maintained, the following additional ground rules will also apply:

. . . .

3. No development effort, beyond required interfaces, shall be included in the basic system. The basic system is defined as one that meets the

---

4. Corr, Christopher F. and Kristina Zissis, *Convergence and Opportunity: The WTO Government Procurement Agreement and U.S. Procurement Reform*, 18 N.Y.L. Sch. J. Int'l & Comp. L. 303, 315 (1999).

5. *See also* Administrative Record (AR) at 219 (DASR Solicitation).

6. AR 6973–74 (Acquisition Plan).

minimum operational requirements, documented in the referenced ORDs. Capabilities not included in the basic system will only be implemented after the basic system has been successfully operationally tested and fielded at the first operational site.[7]

The program's revised Acquisition Plan also mentions NDI radars. The document states that the goal of the program's acquisition approach was to utilize the present advances in the development of DASRs. The Acquisition Plan used a firm-fixed-price contract for most items under the program. Other items were instead to be acquired under a cost-reimbursement approach, because "they either require[d] software development, more definition, or [we]re difficult to accurately scope at contract award."[8] In addition, site preparation tasks for the physical integration of DASR equipment were keyed to cost-reimbursement formulae as they were likely to contain substantial "unknowns" that would change costs at each individual airport site.

Various potential bidders, including Northrop and Lockheed, began efforts investigating the forthcoming solicitation. After determining that the DASR requirements would be too stringent for any system it was currently producing, Lockheed abandoned its pursuit of the contract six months before the solicitation was issued. Hughes Aircraft Company, not a party to this action, had also expressed interest in the contract but withdrew due to what it understood as the solicitation's NDI requirements: "At this point in the competition, we feel that we cannot offer a fully-compliant, true NDI which will provide best value to the government at low risk."[9] Lockheed claims that if the solicitation had not required an NDI system and had allowed development efforts during the course of the contract, it would have bid on the contract. In addition, Lockheed avers that it has in production a system that would meet or exceed the DASR requirements in the present contract, and that it is already

producing a similar radar system under a contract with the Navy. Lockheed's system is used in different circumstances, however, being utilized as a mobile system attached to military vehicles, and designed solely for military usage.

The Air Force issued Request for Proposals No. F19628–95–R–007 ("solicitation," or RFP) on October 19, 1995, for the production, site preparation, installation, and logistics support of DASRs. The DASR contemplated by the RFP was later designated the "ASR–11," which was to be a "fully operational 'turnkey' DASR System[ ]."[10] The RFP stated the ASR–11 was to (1) improve aircraft detection in "clutter" conditions; (2) provide accurate, detailed weather reporting; (3) improve reliability; (4) reduce support costs; and (5) interface with newly developed automation systems. The ASR–11 would accomplish its tasks with a combination of a Primary Surveillance Radar (PSR), which would perform two-dimensional detection of aircraft and weather, and a Monopulse Secondary Surveillance Radar (MSSR), which would perform the same function but in three-dimensions with aircraft that have transponders. The function of the ASR–11 was overall "terminal surveillance," the detection of aircraft as they approach and leave an airport.

The RFP called for an indefinite delivery, indefinite quantity (IDIQ) arrangement, under which a variable number of DASRs would be produced and delivered to the Air Force and FAA over a fixed period of time. The Air Force and FAA would designate how many systems it required by issuing individual Delivery Orders during the term of the contract. The RFP required that the contractor deliver three DASRs initially, two for qualification testing and one "pre-production" system, with up to a total of 213 systems available for order. Because the RFP called for an IDIQ contract, the Air Force and FAA were permitted to order any number of systems from 0 to 213. Contract Line Item

---

7. AR at 10,948–49 (Interagency Agreement B, Subagreement 2, Revision 1–1996).

8. AR at 6986 (Acquisition Plan).

9. AR at 10,984 (Notification of Hughes' Withdrawal from the Competition for the DASR RFP).

10. AR at 274 (DASR Solicitation).

Number (CLIN) 0020 provided that a minimum of zero systems and a maximum of 213 systems could be ordered under the contract. The eventual contract award had a total value, if the maximum number of radar systems were ordered by the government, of $620 million. Nine ordering periods were contemplated by the solicitation, with the first set for 1998 and the last set for 2004. The maximum number of systems that could be ordered for each period was 36. Because each order would take two years to complete, final delivery of the radars was scheduled to occur in 2006.

Within the RFP, the System Requirements Document (SRD) required bidders to propose an NDI solution for the proposed DASR system. The Source Selection Plan (SSP) also stated that the procurement intended an NDI acquisition. The RFP incorporated 48 C.F.R. § 52.202–1, which, as explained above, defines an NDI. Prior to award, the Air Force conducted an Operational Capability Demonstration (OCD) as part of the DASR bid proposals evaluation. At the OCD, each bidder was required to show that its purported NDI DASR system actually possessed the attributes of the system described in its bid proposal. Any variations between the actual system and the described system were required to be disclosed. Such variations could be considered as weaknesses in a bidder's proposal. In addition, the Air Force required each bidder to prepare an SRD Cross Reference Matrix, in which the bidder described, by answering yes or no, whether or not its NDI DASR system currently met the requirements of the SRD at the time of submission of its bid proposal. If the bidder answered no to any of the requirements, its Technical Proposal, in Section 3.2.2.1, must have addressed solutions to the deficiencies. Finally, each bidder was required to produce an Integrated Master Plan and a Master Integrated Program Schedule, documents that described in detail the bidder's proposed approach to and schedule for performance. In its description of its integrated plan, each bidder was required to identify risk areas where the plans might encounter difficulties.

The contract's mandatory requirements are described as "shalls," and desired characteristics of the system are referred to as "shoulds." The NDI nature of the DASR system was included neither as a "shall" nor a "should" in the contract. The document entitled "Information for Proposal Preparation", which provides instructions for the System Specification (SS), also does not make NDI a requirement, despite the fact that the SS is comprehensive in describing performance under the contract. Nowhere in the Statement of Work Structure SOWS, which directed the bidders in their production of a Statement of Work (SOW), does it mention an NDI requirement.

Northrop, Raytheon, and a third company, ITT Industries, Gilfillan Division (ITT Gilfillan), submitted bid proposals on the contract. Raytheon proposed a system that was a modified version of its ASR–10SS primary radar, combined with the Condor Mk 2 Monopulse Secondary Surveillance Radar (Condor MSSR). Both radar systems were already in production and in use in various foreign countries. The ASR–10SS was a second-generation solid-state PSR that had been sold to many international clients. The ASR–10SS is operational at airports in Canada, Trinidad, India, Oman, Hong Kong, China, Switzerland, Taiwan, Australia, and Brazil. The Condor MSSR is in use in 22 different foreign countries.

In its bid proposal, Raytheon made several representations concerning the nature and features of its radar system. Raytheon stated that its DASR system was in production, and that Raytheon had the systems in inventory and ready for immediate delivery. Raytheon also asserted that the DASR system was without development risk, although minor modifications would be needed to bring the system into full compliance with the RFP requirements. These modifications, Raytheon informed the Air Force, would include changes to both system software and hardware. [* * *][11] Raytheon made this same assertion as to modifications at the OCD. Raytheon mentioned in its cost proposal, however, that in total at least 24 modifica-

11. [* * *]

tions would be needed to bring the system into compliance with the contract requirements. [* * *] Despite these modifications, Raytheon still claimed that it met all requirements in the RFP and had 98% of the features requested by the Air Force. Raytheon stated that it would be able to meet schedule requirements for the DASR program due to the NDI nature of and the low risk associated with its system.

After the OCD, Raytheon produced Interface Requirements Documents that explained 50 deficiencies out of a total 265 requirements in the SRD. Raytheon proposed modifications to its PSR, explained in a slide produced after the OCD and delivered to the Air Force. Raytheon stated to the Air Force that its overall approach was one of development based on the use of NDI and commercial-off-the-shelf (COTS) components.

ITT Gilfillan, in its proposal for the contract award, proposed a transmitter that it had developed recently. ITT Gilfillan stated that it needed to do software development, and it informed the Air Force that it would have to make modifications to its receiver, and develop a Surveillance Data Translator, maintenance processor subsystems, and CD-2 interfaces.

Northrop also proposed a DASR system, submitting two separate proposals for consideration. Northrop's proposed DASR–SS system solution contemplated a newly-developed solid-state PSR, including a new receiver, signal/data processor, architecture, and several other modifications to its then-current system. Northrop did not rely solely on NDI and COTS items for its technical solution, stating that it would have to develop software and hardware interfaces for the DASR system. Northrop suggested an "open architecture" for the DASR in order that easy upgrades might be made as the performance of the contract progressed toward compliance with the contract requirements. Northrop's new PSR was not in use at any airport at the time of award, and instead had only been tested at the Westing-house ATC field test site. In addition, Northrop proposed the development of over 34,-000 lines of code for the system interfaces.[12]

In July 1996 the Air Force signed the SSP, which provided the framework and factors to be utilized by all government officials participating in the DASR source selection. The SSP defined the criteria by which the officials would select the awardee. The SSP considered the OCD to be a calculator of risk, not a test that would result in a passing or failing rating. The Air Force concluded the following from its evaluation of Raytheon's bid proposal: (1) Raytheon's proposed system was in production for foreign countries and had negligible development risk; (2) the system needed only minor modifications to meet DASR requirements; (3) the system met all DASR requirements and most desired features, including detection in weather and clutter conditions; (4) the current system met almost all SRD requirements; (5) Raytheon's proposed Software development was properly estimated and low risk; (6) Raytheon's system, tested at the OCD, was an NDI and therefore would meet schedule requirements with low risk; and (7) the system transmitter was mature, in production, and without development risk. The Air Force questioned Raytheon on various aspects of its proposed system during and after the OCD, and was satisfied with its answers and its product. During the OCD, Raytheon was permitted by the Air Force to utilize previously gathered data on its DASR system, due to the Air Force's finding that such data was a satisfactory substitute for new testing. The Source Selection Authority found each of the four proposals to be technically acceptable. The Air Force found that Raytheon had the only system "in production," which was one of the important discriminators in the proposal evaluation, and therefore found Raytheon's proposed DASR system to be the overall best value. On August 9, 1996, the Air Force awarded the DASR contract to Raytheon based on its

12. Without the need to painstakingly propose a system that met all requirements without development, in other words, a proposal that met an NDI requirement, Northrop claims that it would have prepared only one bid instead of two, that it would have proposed the same MSSR system and Surveillance Data Translator that it had previously fielded under a previous FAA Mode S contract, and that its bid price would have been considerably lower.

superior technical solution and lower performance risk.[13]

Northrop and ITT Gilfillan protested the award to Raytheon before the U.S. General Accounting Office (GAO). Northrop and ITT Gilfillan did not argue at the protest that Raytheon's system was not NDI in nature. Instead, the protestors insisted that the government had improperly considered their proposals, arguing that both Northrop and ITT Gilfillan had "in production" systems as well as Raytheon, despite the need for modifications to their systems. At the protest hearing, government witnesses and Anthony Polise, Raytheon's DASR Proposal Manager, stated that modifications to the existing NDI system produced by Raytheon would be minor and in no way extraordinary; Mr. Polise stated the proposed PSR and MSSR of the system was nearly identical to the system that was currently coming off the production line at the time of contract award. [* * *] The GAO denied the protests. *Northrop Grumman Corp.*, B–274,204 (27 Nov. 1996), 96–2 CPD ¶ 232, 1996 WL 764163. One hundred two days were added to the contract term to reflect the delay associated with the protest.

At the time of contract award, the Air Force ordered two pre-production systems (CLINs 0001 and 0007) to be used for Air Force and FAA qualification testing, to be delivered November 19, 1998. Orders for the regular production DASR systems were not originally scheduled to begin until Raytheon successfully completed a government-run initial operational test and evaluation (IOT & E) with these two pre-production systems. IOT & E would be performed once the initial test systems were delivered, and the DASR program's pre-production phase was to be complete by September 1999. A third system (CLIN 0008) was procured for FAA testing via Contract Modification P0002 and Delivery Order 0003 on September 29, 1997. Modification P0002 requested additional equipment to be provided with CLIN 0008, increased its price, and delayed delivery by six months, setting a delivery date of no later than September 1999. Regular production would begin in Ordering Period No. 3 (FY98), continuing through Ordering Period No. 9 (FY04).

Performance on the contract encountered many difficulties, however, and the parties were forced to make changes and execute multiple rounds of testing to determine the compliance of Raytheon's system with the contract specifications. Various changes to the contract are apparent in the record. According to a declaration by Michael Freie, the DASR Program Manager for defendant, thirty-two DASR modifications have been made to Raytheon's system. These modifications are mentioned in a briefing entitled "DASR DT & E Familiarization," dated September 3–4, 1997. Forty proposed modifications are listed in the briefing documents, 10 of which are listed as deleted.[14] The modifications are also referred to as "Development Items." Of the 30 modifications not deleted, 23 are described as necessary for compliance with the RFP's DASR requirements. Table VI of Raytheon's Master Test Plan, dated December 5, 1997, also lists a similar number of modifications to the system. The Master Test Plan explains that the modifications, again, were necessary for achievement of DASR performance requirements. The modifications are updated in the "Systems Engineering—Technical Interchange Meeting (TIM)" briefing, dated January 14–15, 1998. The TIM briefing includes a chart called "Major Development Steps," which describes development efforts for the DASR system. Thirty modifications are listed, with five modifications relating to system interfaces. Nine of the 25 modifications unrelated to interfaces were complete at the time of the TIM briefing.

The Air Force concluded that 10 of the 32 modifications implemented involved medium or high risk. Raytheon has admitted that it underestimated the number of changes it would have to make to the PSR hardware and software. [* * *][15] [* * *][16]

---

**13.** Plaintiff's bid proposal included an evaluated price that was approximately $15 million lower than Raytheon's price.

**14.** AR at 17,502–12 (DASR DT & E Familiarization—3–4 Sep. 97).

**15.** [* * *]

**16.** [* * *]

Raytheon has submitted 15 Engineering Change Proposals (ECPs) that would change the system specification requirements, or the approach to compliance with the requirements. ECP 10, entitled "PSR Transmitter Upgrade," proposed a transmitter upgrade for the system. In 1997, Raytheon began development of a new transmitter for the ASR–11. This "Transmitter Development Program" (TDP) was established to meet the schedule requirements of the DASR contract. The three pre-production DASRs initially delivered to the Air Force and FAA included a pre-production configuration of the PSR transmitter. Raytheon planned to replace the first transmitter with a newly-configured transmitter before full-scale DASR production. The TDP was not mentioned anywhere in Raytheon's Technical Proposal; however, Raytheon's Cost Proposal stated that its pricing was based on the use of a "lower cost transmitter" than the one contained in the production model then available. Defendant did not mention the new transmitter in its evaluation documents, and Raytheon did not formally request authority for the replacement of the first transmitter until December 12, 2000. This ECP represents a Class I change to the system requirements, defined in the SOW as "any change which effects [sic] the form, fit, or functional requirements of the DASR System."[17] Raytheon informed defendant at that time that failure to authorize ECP 10 would result in a day-for-day delay in the completion schedule dating back to October 2000. The DASR Contracting Officer currently believes that the ECP will result in a savings to defendant on the contract; yet, defendant has not to this date approved ECP 10. Raytheon seems nonetheless to have proceeded with performance as if ECP 10 has already been approved.

In addition, Raytheon has requested 18 waivers of system specification requirements. While most of the requests for waiver were reasonable relaxations of low-level require-ments, plaintiffs assert that those requested for environmental conditions represented major deviations from the original contract requirements. Raytheon submitted two requests for waiver that proposed to narrow the temperature and humidity ranges within which the system must operate up to DASR requirements.[18] A Configuration Review Board (CRB) met with Raytheon representatives on March 2, 2000, in which Raytheon explained that its system did not meet the environmental requirements and that to redesign and re-test the system would be too costly and time-consuming to be justified. Raytheon requested waiver of the requirements, and stated that because the contract called for an NDI and COTS system, the contract intuitively contemplated a high probability that the system would not meet many DASR requirements. The CRB then asked Raytheon, "Was it intuitive to Raytheon that the DASR program would not want the COTS to meet all shalls, or at a minimum, be tested to determine the environmental parameters?"[19] In addition, 13 more waiver requests submitted by Raytheon cite costly redesign and retesting as a justification. Raytheon states that these waivers have not all been granted, and that those that have been are minor and low risk.

Raytheon has also had to make many DASR Software changes over the course of performance of the contract. In April 1997, Raytheon informed defendant that changes to the Software for the PSR and MSSR would increase to cover 70% of all software modifications for the contract, [* * *]. As of December 1998, new and modified lines of programming code necessary for DASR compliance increased 77% overall, including an increase of over 1200% for PSR and MSSR Software. Defendant states that it has no data on new and modified code other than the December 1998 figures. Plaintiffs maintain that there have been 10–15 Software

---

**17.** AR at 884 (RTP, Attachment 3).

**18.** The requested waivers were termed DASR–WAV–7A, MSSR CMS Temperature and Humidity Non–Compliance and DASR–WAV–25 Rev(A), PSR COTS/NDI Equipment (Production) Envi-ronmental Non–Compliance. The waivers requested that the system should be able to survive temperatures of –20C and less than 100% humidity.

**19.** AR at 35,933 (Waiver DASR # 7, August 4, 1999).

"builds" (additions to total lines of software code), involving new or modified code since late 1999, including builds that involve the PSR and MSSR.

The changes to the software were aimed at solving false target reporting through use of a "plot extractor," "plot amplitude thresholding," "automatic Doppler filter editing," and "Track Quality" improvements. Plaintiffs state that the record does not include the details of these builds, but contends it is beyond question that they have occurred. Plaintiffs also assert that builds must have taken place from December 1998 until late 1999. Raytheon admits that additional lines of code for its automation systems have exceeded estimates, but states that this is due to its subcontractor, Sensis, having underestimated the amount of code it could reuse in the new system.

In addition, Raytheon collaborated on a project called the Pre–Planned Product Improvement (P$^3$I) with Lincoln Laboratories (Lincoln), a support contractor. Defendant contends that the purpose of the P$^3$I was solely to enhance the weather-channel performance of the system beyond what was required by the contract. Plaintiffs contend that various documents in the record show, however, that the P$^3$I was implemented to address deficiencies in Raytheon's compliance on the DASR requirements, especially with regard to false target generation and clutter. Various documents created by Lincoln, Raytheon, and defendant, including the contract with Lincoln itself, state that the P$^3$I either specifically treated problems in bringing the Raytheon system within the contract requirements, or would at least have to create solutions to such problems as a primary hurdle before implementing its enhancement of weather-channel performance. Raytheon in fact has been subcontracted by Lincoln to aid in developing algorithms and software design that are compatible with the ASR–11 system. Raytheon states that this subcontractor relationship is necessary for Lincoln to gain access to critical information for the development of the weather technology. According to Raytheon, all issues with weather have been resolved without use of P$^3$I results.

Extensive testing, much of it unplanned in the original solicitation and contract, has taken place during performance. On December 23, 1999, the Air Force Operational Test and Evaluation Center (AFOTEC) completed testing of Raytheon's DASR system. AFOTEC identified 216 deficiencies with Raytheon's system, including 11 Category 1 deficiencies, which hinder operational readiness. Several important problems were found to exist with the system. First, the PSR's "probability of detection" ($P_d$), which relates to the ability of the system to detect aircraft in the approach/departure corridors at an airport, was found to be degraded when a target is in close proximity to the radar. This problem affects flight safety for takeoff and landing. Second, the PSR generated too many false target and weather reports. Third, AFOTEC found a possible inherent flaw in Raytheon's system architecture with regard to the PSR antenna tilt. AFOTEC discovered that in clutter conditions, settings implemented to reduce false tracking reports also rendered the system unable to track many real targets at low altitudes and close ranges. These problems signaled radar difficulties during takeoff and landing sequences, which are critical to flight safety. Raytheon states that this report is based solely on extra-contractual Operational Requirements Document (ORD) specifications, and not on actual contract requirements, and therefore many of the deficiencies are deficient according to ORD, but not necessarily according to the contract terms. The AFOTEC report, despite its finding of many problems, did not come to the conclusion that Raytheon could not rectify these problems. An evaluation team from Air Traffic Control and Landing Systems also performed a test of the DASR system, and found that the system supported the mission requirements for Eglin Air Force Base (Eglin), and meets requirements for participation in the National Airspace System.

Subsequent testing has been performed at various times. Tests were conducted at Eglin in March 2000. There, Raytheon's system could not maintain a $P_d$ of 80%, which was the minimum in the DASR requirements. False weather was created by the

system up to level 5, or severe, due to "Anomalous Propagation" conditions. In addition, false track report rates exceeded 10 per scan, the maximum allowable rate under the requirements. Raytheon's system confirmed to produce "phantom clutter," which makes detection of low flying aircraft difficult, be they approaching or departing aircraft, or aircraft limited to flight under 10,000 feet.

Additional testing was performed at Eglin from April 29, 2000, to May 19, 2000. A report of the testing was released July 17, 2000. Also, defendant conducted tests in June and July using new Software builds (builds 350 and 360). Unfortunately, the problems were not resolved at either test. FAA performed testing on June 27–29, 2000, in Stockton, California, at the ASR–11 Operational Inventory. The results identified 44 problems with Raytheon's system, including nine Category 1 deficiencies and 30 Category 2 deficiencies. The major problems were continuing false weather reports and a gap in the weather display between long-pulse and short-pulse radars. Further testing in October 2000 and early in 2001 revealed small improvements but still no compliance with DASR requirements. Software builds 380 and 390 did not solve the problems, and the most recent testing left the system with a $P_d$ of 46% when new Plot Amplitude Thresholding functionality was enabled, with the False Target Editor still eliminating real targets more efficiently than false targets. Raytheon has stated as well that its system cannot meet the Maximum Reflexivity Bias requirement of the System Specification, and that waiver and specification change is needed for the system to be in compliance.

Various additional testing has been required of Raytheon by the Air Force because Raytheon's existing test results at the time of award, upon which the Air Force relied in making its decision to award the contract to Raytheon, have needed supplementation as required by the Air Force. The Air Force has also required new testing even when existent testing on its face contained sufficient information for test results under the contract.

The DASR program is now well behind schedule, in part due to the aggressiveness of the schedule conflicting with the complexity of the contract and the development and problem solving efforts. Because of these delays, Raytheon has proposed changes in order to prevent the DASR system from becoming obsolete due to the increased passage of time on the contract. In Raytheon's Contractor Performance Assessment Report (CPAR) prepared by the DASR Program Office for December 1997 to December 1998, most of the delays were attributed to the problems with new software code encountered by Sensis. Other CPARs state that Raytheon was considered a competent contractor that met or exceeded contract requirements despite the delays. The DASR Program Executive Officer (PEO), Brigadier General Robert W. Chedister, and the DASR Program Manager have expressed that they do not believe Raytheon made any misrepresentations in its proposal. Defendant has not formally extended the length of the contract with Raytheon, as it is waiting for the results of still further qualification testing by DOD and FAA officials. Both parties expect the orders for DASRs to extend well past the original end date for the contract, most likely into 2010 or later. The Air Force has designated Raytheon's schedule risk as high during the course of performance. The Program Manager stated that Raytheon at one point was 16–20 months behind on the preproduction schedule that was set for 24 months, and attributed this schedule slip to Raytheon's underestimation of development work needed to bring its system in line with the SRD.

In the beginning of 2000, the Air Force conducted a briefing to consider whether to authorize low-rate initial production (LRIP) on the Raytheon DASR systems. The authority to order production systems under LRIP was delegated to PEO. As mentioned, previous testing and reports from AFOTEC showed major deficiencies in the DASR system performance with regard to contract requirements. AFOTEC recommended that the system should pass a Developmental Test/Operational Test before LRIP was authorized. An AFOTEC report from February 2000 revealed over 200 deficiencies in the system, including several "Category I" defi-

ciencies, which directly affect air traffic control operations. The report stated that the system did not meet interface requirements, that the PSR performance was unacceptable in close proximity to radar, and that the system created false plots and weather cells, and failed to detect real ones, well in excess of the allowed parameters under the contract requirements. At the LRIP Briefing, however, the AFOTEC stated that LRIP could go forward because Raytheon had successfully completed an IOT & E.

In the "Background" portion of the LRIP Briefing, defendant again stressed the importance of the NDI nature of the DASR program and procurement, stating that the acquisition is centered on Raytheon's production-line system, and that NDI/COTS strategy reduces risk factors, time getting the system to field, and the cost to defendant for procurement. The LRIP Briefing also listed nine differences between Raytheon's original ASR–10SS production system and the system called for by the DASR program. According to defendant's DASR Program Manager, the PEO was apprised of all modifications to the contract, and that all 32 modifications were included in the aforementioned nine differences listed in the briefing. The PEO has stated that he was briefed on the fact that 32 modifications were necessary to bring the system in compliance with the DASR requirements. The PEO was also informed that 238 deficiency reports (DRs) had been issued on the contract, and that 11 DRs were Category I deficient. The PEO understood that previous probability of detection problems in the PSR involved important difficulties with "target loss of detection," but that the problems had been resolved.

Northrop alleges, however, that the PEO was kept unaware of many important facts regarding the problems with the system that Raytheon had provided by the time of the LRIP Briefing. These facts include: (1) the Program Office had identified some of the modifications as high or medium risk; (2) Raytheon planned to substitute the new transmitter into its system; (3) Lincoln had predicted one of Raytheon's waiver requests of an important specification requirement months before Raytheon made the request; (4) defendant would have to authorize further development even after proceeding with LRIP; (5) AFOTEC has recommended against proceeding with LRIP; (6) the system had significant difficulties in target detection in approach/departure corridors; (7) various real targets (non-aircraft targets) would be permitted to be filtered out by the system so that it could meet requirements; (8) Lincoln was performing development work on the contract; and (9) Raytheon had underestimated the necessity to program new Software for its PSR and MSSR. Also, Northrop asserts that the PEO was misinformed by subordinates concerning $P_d$ results and the ability of the Raytheon system to track non-aircraft obstacles. Lockheed additionally claims that the PEO was not informed about the technical risk of the 32 modifications to the system, and that certain of the modifications had been designated as medium or high risk. It also contends that the PEO did not have knowledge of the previous AFOTEC recommendations that all deficiencies with the system be resolved before Raytheon would be ordered to proceed with LRIP.

Raytheon avers that the PEO had all important information before him when he made his decision to proceed with LRIP. The PEO has stated that he was briefed on all the DRs, and that the 11 open Category I deficiencies were close to solution. Other problems were also to be handled with very low risk of failure. In addition, the Air Force Flight Standards Agency (AFFSA) approved of the system's performance at that point. Raytheon also explains that LRIP was supported by the DASR Program Office, AFOTEC, AFFSA, FAA, the Navy, and the Army. AFOTEC had indeed found in its latest testing before the LRIP that the proposed fixes for the system would bring the system into position for effective and suitable operational use, and that the system is capable of maintaining flight safety at the airports where it is installed.

On February 28, 2000, the DASR Program Office recommended to the PEO that he authorize the DASR LRIP. On that same day, the PEO directed the Program Office to

begin LRIP of a maximum of 13 DOD and 24 FAA DASRs. The DASR Program Office then issued Delivery Order 0019 on April 27, 2000, requesting 11 DASRs, two for the Air Force and nine for the Navy. On July 27, 2000, the FAA Product Team entered into a Memorandum of Agreement regarding its production decision, stating that regular production of the ASR–11 DASR should commence. In that agreement, the Product Team committed to solving the ongoing problems with the system before putting the systems into regular use. On September 26, 2000, the Air Force issued Delivery Order 0024, consisting of 12 DASR systems for FAA and various data CLINs.

On May 24, 2000, Northrop filed a complaint for injunctive and declaratory relief and a motion for preliminary injunction, alleging (1) that Delivery Orders 0019 and 0024 constitute an improper relaxing of contract requirements such that the statutory requirements for competition of government contracts were violated; and (2) that Raytheon wilfully misrepresented in its DASR system proposal the capabilities of its current system. Northrop agreed soon thereafter to withdraw its motion for preliminary injunction, so that the court could focus on the compilation of the administrative record and the final disposition of Northrop's motion for permanent injunction. Lockheed filed its complaint on June 29, 2000, joining Northrop only in the claim alleging a violation of federal procurement competition law, and not in the misrepresentation claim. On August 1, 2001, the court heard oral argument on the parties' respective cross-motions for judgment on the administrative record.

*Discussion*

## I. *Jurisdiction*

This court's bid protest jurisdiction is set forth in the Tucker Act, which provides, in pertinent part:

Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (Supp. II 1996).[20] In this case, plaintiffs Northrop and Lockheed are not simply challenging an award, but instead are claiming that there has been a violation of statutory requirements for competition in government procurements. These types of protests, asking the court to direct new solicitation of and competition for government contract work due to a cardinal change in a previously-awarded contract, are within this court's jurisdiction. 41 U.S.C. § 253j(d) (1994) (prohibiting protests based on delivery orders executed pursuant to contract except "for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued"); *see, e.g., AT&T Comms., Inc. v. Wiltel, Inc.,* 1 F.3d 1201 (Fed.Cir.1993); *Phoenix Air Group, Inc. v. United States,* 46 Fed.Cl. 90 (2000); *CCL, Inc. v. United States,* 39 Fed.Cl. 780 (1997).

## II. *Standing*

Defendant and Raytheon argue that Lockheed is not an interested party in this case, and therefore Lockheed's claims should be dismissed. The Tucker Act states that interested parties have standing to bring protests in this court, 28 U.S.C. § 1491(b)(1), but does not define the precise meaning of the term. The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) therefore has adopted the definition of "interested party" located in the Competition in Contracting Act

**20.** As of January 1, 2001, this court has assumed sole jurisdiction over governmental award decisions. Pub.L. 104–320, § 12(d), 110 Stat. 3870, 3875 (1996) ("(d) SUNSET.—The jurisdiction of the district courts of the United States over the

actions described in section 1491(b)(1) of title 28, United States Code (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress.").

(CICA). *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1300–02 (Fed. Cir.2001) (pagination in federal reporter not yet available). The CICA defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (1994 & Supp. II 1996). The Federal Circuit has relied on various factors in determining this interest, including, but not limited to, whether a contractor has (1) submitted a proposal; (2) withdrawn from the pertinent procurement; or (3) rated below second among prospective bidders. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed.Cir.2001).

■ When a disappointed bidder brings a bid protest alleging a cardinal change to a contract, that bidder essentially argues that new contract work has been awarded without competition. This argument is based on the fact that the changes to the previously awarded contract represent work that is completely separate from the work that has already been awarded in that contract, as the new work is outside the scope of the original competition. *CCL*, 39 Fed.Cl. at 789. The protest does not assail the propriety of the award of the original contract that was cardinally changed, but instead demands initial competition on the work.[21] A party's standing depends on its interest only in the proposed initial solicitation for the new work. *Id.* The court will determine standing based on whether the protesting contractor could compete for the new contract work and whether it has an economic interest in such work, unhindered by the restrictions applicable when a bidder protests a solicitation that has already taken place. *Id.* at 790.

■ Although Lockheed did not submit a proposal on the original contract work, its protest is not based on wrongdoing by defendant in awarding the original contract to Raytheon.[22] Instead, along with Northrop, Lockheed argues that the relaxing of the alleged NDI requirement in this contract amounts to a cardinal change, and therefore a new procurement must be executed based on the contract work as changed. In this case, Lockheed did certainly have an opportunity to make a proposal on the original DASR procurement in 1996. If the court finds that a cardinal change has occurred on that contract, however, the result is the existence of contract work that has never been competed. Lockheed has standing, therefore, if it shows that it would participate as a bidder for, and have an economic interest in, only that new uncompeted work, not the work as contemplated by the original procurement. *See Phoenix Air,* 46 Fed.Cl. at 102.

Lockheed now states that it possesses the technology and produces a radar system that could meet the requirements of the work presently being performed by Raytheon. Although defendant and Raytheon make small attempts to refute those claims, it is clear that Lockheed would be a serious bidder on the proposed resolicitation, and that it would have a substantial chance of receiving the award. *Cf. Alfa Laval Separation v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999). There is no real doubt that Lockheed would participate in a new procurement if one materialized, and that Lockheed would receive pecuniary benefit from the award of that contract. Lockheed is therefore an interested party.[23]

### III. *Judgment on the Administrative Record*

Motions for judgment on the administrative record are treated in accordance with

---

21. In this way, a protest alleging cardinal change is similar, regarding standing analysis, to a protest by a prospective bidder that was excluded from an allegedly improper sole-source procurement: in both cases, the contractor never had a chance to make a proposal on the contract work at issue. *See, e.g., Myers Investigative & Sec. Servs., Inc. v. United States*, 47 Fed.Cl. 605, 619 (2000).

22. Indeed, unlike Northrop, Lockheed does not allege misrepresentation by Raytheon in its bid proposal documents. Transcript of Oral Argument on Cross–Motions for Judgment on the Administrative Record, Aug. 1, 2001, at 49. It therefore asserts no tainting of the original procurement.

23. Defendant and Raytheon have not challenged Northrop's standing in the case.

the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS,* 998 F.2d 979, 982 (Fed.Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518

(1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

■ The court reviews challenged agency decisions, such as those presented in bid protest cases, according to the standards provided in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994). Thus, the court must determine whether defendant's actions towards a plaintiff were "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law ...." 5 U.S.C. § 706(2). "[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa,* 238 F.3d at 1332.

■ Furthermore, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996); *see also Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) (only clear and prejudicial violations warrant relief). To establish prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award. *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996).

■ The scope of review of the agency's actions is limited to the administrative record developed by the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). In the bid protest context, however, the court has per-

mitted supplementation of the administrative record under limited circumstances. *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997) (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989)). The court has allowed extensive supplementation of the administrative record in this case in order to ensure that it had a complete record from which to make its decision.

Plaintiffs have brought their bid protest claims to challenge the further performance of the DASR contract between defendant and Raytheon. Plaintiffs allege that the original solicitation as competed contained an absolute requirement for bidders to propose a true NDI radar system as defined in the pertinent federal regulations. Plaintiffs state that the problems encountered in the performance of the contract show that Raytheon's DASR system has needed substantial, major, and developmental changes that prove the system is not NDI. Because Raytheon does not have an NDI system, plaintiffs argue that defendant has exceeded the scope of the original solicitation by ordering systems, the nature of which was not contemplated by the original solicitation. Plaintiffs demand, therefore, a new solicitation for the changed DASR system being produced currently under the DASR contract. Northrop also argues separately that the fact that a multitude of problems have occurred in performance of the contract shows that Raytheon must have known of the problems before making its proposal, and that Raytheon therefore misrepresented the abilities and maturity of its DASR system in order to receive the award of the DASR contract.

Defendant and Raytheon maintain that the NDI nature of the solicitation was merely a strategy of procurement, and that the maturity of a given bidder's system was only a factor in determining the risk in each bidder's proposal. They state that the language in the solicitation did not show that NDI was a requirement. Defendant and Raytheon maintain, in addition, that the changes that have been made to the contract are minor, and that most will provide a higher quality system than previously proposed through permissible technological upgrades. Furthermore, Raytheon avers that it made no

material misstatements concerning its system, and that it never intended to misrepresent its capabilities to defendant. It claims that the problems on the contract have come in areas where it was difficult to judge how much work was needed, such as the development of software interfaces for the DASR system, and that various requests by defendant to provide more testing information have pushed the completion of performance back further than expected. Defendant and Raytheon also state that progress has been made on the difficulties they have encountered, and that both parties expect Raytheon's system to perform to specifications in the near future.

### A. Cardinal Change

#### 1. NDI Requirement

In this case, Northrop and Lockheed argue that the solicitation and the contract as awarded contain a requirement that Raytheon deliver an NDI DASR system. Raytheon and defendant counter that there is no NDI requirement in the contract, and that instead the use of NDI in the completion of the contract was merely encouraged in accordance with the government's general policy maximizing the use of NDI in government contracts. *See* 41 U.S.C. § 264b ("Preference for acquisition of commercial items").

 This issue presents the court with questions of contract interpretation. The court may rule on such interpretations as a matter of law. *Nat'l Rural Utils. Coop. Fin. Corp. v. United States*, 14 Cl.Ct. 130, 136 (1988), *aff'd*, 867 F.2d 1393 (Fed.Cir.1989). The intent of the parties controls contract interpretation, and the "primary function of the court is to ascertain the intent of the parties to a contract." *Int'l Transducer Corp. v. United States*, 30 Fed.Cl. 522, 526 (1994) (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed.Cir.1988); *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547 (1971)). In interpreting a contract, the court seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 235, 575 F.2d 855 (1978)). Contract interpretation begins with

the plain meaning of the provision in question. *S.W. Aircraft Inc. v. United States,* 213 Ct.Cl. 206, 212, 551 F.2d 1208 (1977). "[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona,* 216 Ct.Cl. at 235–36, 575 F.2d 855. These rules apply to interpretation disputes over language found in solicitations for government contract work as well as for executed contracts. *See, e.g., Chas. H. Tompkins Co. v. United States,* 43 Fed.Cl. 716, 722 (1999) (citing *B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 299, 614 F.2d 748 (1980)).

■ The court will first examine the definition of NDI as it existed in the solicitation. At first glance, the court would seem to need to proceed no further than the inclusion of section 52.202–1(e) of the FAR, which provides the formal definition of NDI, reiterated here:

(1) Any previously developed item of supply used exclusively for governmental purposes by a Federal agency, a State or local government, or a foreign government with which the United States has a mutual defense cooperation agreement;

(2) Any item described in paragraph (e)(1) of this definition that requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency; or

(3) Any item of supply being produced that does not meet the requirements of paragraph (e)(1) or (e)(2) solely because the item is not yet in use.

48 C.F.R. § 52.202–1(e). There is no doubt that the NDI definition in the FAR is clear. Usually, the court would adopt the plain meaning of this definition without reservation. Consideration must be given, however, to the source of the deference the courts place on the plain meaning of a contract. Determining the intent of the parties is the key to the interpretation of contract language. *King v. Dep't of Navy,* 130 F.3d 1031, 1033 (Fed.Cir.1997); *Firestone,* 195 Ct. Cl. at 30, 444 F.2d 547. The reliance on the plain meaning of contractual provisions is perhaps the most useful tool at the court's disposal in discovering the parties' intent, because the court assumes that the parties have drafted and approved such language in a given contract. When it is apparent from consideration of the circumstances surrounding the formation of the contract that the reason for the existence of contract language is something other than the parties' intent, this assumption of intent may be eradicated. This is not to say that the plain meaning of contractual language will not be ultimately accepted as the binding interpretation on the parties in a given case; it means merely that the court must delve further into a determination of the intent of the parties before such interpretation is finalized.

In this case, when the court examines the reason for inclusion of the FAR definition of NDI in the solicitation, it is apparent that the incorporation of that provision had nothing to do with the parties' intent. Indeed, another FAR section, 48 C.F.R. § 2.201 (2000), requires that the NDI definition be incorporated by reference into all solicitations for government contracts that are not eligible for simplified solicitation, such as the solicitation at issue in this case. Although federal regulations that are restated in contract language or are incorporated by reference can show clear evidence of the intentions of the parties, in this case no such clarity of intent exists because the NDI definition was forcibly incorporated by reference, without regard to the intent of any interested party.

The court will therefore look first to other uses of the term "NDI" within the solicitation, and then, if any vagueness or ambiguity exists, to uses of the term outside the solicitation language, such as the bidders' bid proposals and defendant's various evaluations. Although there are several instances in the solicitation in which the term "NDI" is used, almost none of them provides a clue as to the meaning of the term as used. For example, the cover letter introducing the formal RFP of the solicitation stated that the Air Force was "conducting a joint program with the Navy and Federal Aviation Adminis-

tration (FAA) for the site survey, site design, site preparation, production, installation, and logistics support of up to 213 Nondevelopmental Item (NDI) radars."[24] Plaintiffs rely heavily on these uses of the term "NDI," but such instances lend no aid to the determination of the term's definition. Plaintiffs simply point back to the FAR definition, which the court must call into question as explained above. Such bare, conclusory uses of the term "NDI" do not bring the definition question closer to resolution.

A few places in the solicitation, however, do shed some light on the way defendant was construing the term "NDI." In the ORD, defendant included language concerning a requirement threshold: "Threshold reflects limits of available Non Developmental Item (NDI) technology." Another parameter states that a technical requirement was changed to reflect "limits of current digital NDI technology."[25] Both of these statements use the term "NDI" not as a certification that the items meet system specifications, but instead that current, existing technology, or "NDI" technology, actually forced the requirements of the solicitation to be downgraded. In the solicitation's OCD Guidance document, one of the listed objectives of the OCD was to "[d]emonstrate the Offeror's NDI product is representative of the DASR proposed in the technical proposal."[26] The OCD was meant to test the different bidders' systems to make sure they could meet system specifications. It seems, however, that defendant could properly make a decision on whether a given system was NDI only after the OCD, as NDI status is inextricably linked to the needs of the procurement. In this statement, the term "NDI" has already been attached to the products that would be tested at a later date.

These invocations of the term provide the first hints that defendant, as well as Raytheon and plaintiffs, was not using the term "NDI" in the strict sense of the FAR provision, but instead as a general term meant to denote an item that represented a finished product without regard for the specific requirements of this solicitation. This interpretation springs from the strict meaning of NDI as found in the FAR provision. The FAR states that an NDI is an item that "requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency ...." 48 C.F.R. § 52.202–1(e)(2). The phrase "requirements of the procuring agency" shows that an NDI is an item that needs minor modifications to *meet the specific requirements of an individual procurement,* and not any basic set of requirements existing outside such procurement. An item cannot be termed validly as an NDI, therefore, except when it is evaluated against the requirements of a particular procurement. Yet in the solicitation items were described as NDI either without specific reference to the requirements of the procurement, or before a determination of whether they meet the procurement's requirements has been made. This use of the term marks a noticeable relaxation of the definition of NDI located in the FAR, and incorporated into the solicitation.

The definition of NDI in the solicitation is therefore ambiguous. The court will consider extrinsic evidence to clarify the definition of NDI as utilized in the solicitation. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994 (1972) ("[S]tatements of the parties during negotiations ... [may be utilized] in aid of the interpretation of ambiguous or uncertain clauses in written agreements. Expressions of the parties during negotiations for the contract are ... a frequent source for interpretation of its text." (internal citation omitted)); *KMS Fusion, Inc. v. United States,* 36 Fed.Cl. 68, 77 (1996). An inspection of the bid documents of Raytheon reinforces this notion of a general use of NDI indicating products that are already in production, but not necessarily in compliance with the specific requirements of the solicitation. Raytheon

---

**24.** RFP Cover Letter (not Bates stamped for AR).

**25.** AR at 28 (Operational Requirements Document (ORD)).

**26.** AR at 439 (DASR Solicitation).

refers to its PSR as NDI, but only in relation to other contracts with other military agencies.[27] Under the strict definition of NDI, the determinations of the NDI nature of a product made in past contracts do not equal an NDI for another specific procurement unless the requirements of the previous contract and the current solicitation were identical. There is no evidence that the previous contracts were substantially similar to the solicitation at issue here. Also, throughout its technical proposal, Raytheon uses the term "NDI" in conjunction or interchangeably with the terms "existing," "field-proven," "mature," "in-production" and "in use."[28] Raytheon's cost proposal continues this relaxed usage. While these terms are certainly in accord with the characteristics of an NDI product, they are not the equivalent of the definition of an NDI. Furthermore, they do not denote a determination of the most crucial factor for an NDI product, which is whether the product meets the requirements of the present solicitation. The cost proposal also contains a statement that some NDI products would need modifications to meet specifications. This statement is completely redundant if Raytheon considered the definition of NDI under the FAR. The statement makes more sense when the reader assumes that Raytheon was using NDI as meaning merely "existing" or "in-production."

Northrop's proposal documents reveal the same relaxed use of the term "NDI." Northrop uses NDI to mean "modern," "fully-developed," "in-production," and "field-proven."[29] It refers to its ASR–9 and MSSR radars as NDI products when explaining that the products have been installed and used in performance of other contracts. Northrop also states that it conducted trade studies "using Commercial–Off–The–Shelf (COTS) and Non–Developmental Item (NDI) hardware and software where appropriate."[30]

This use of NDI does not relate to the requirements of the solicitation, but instead is more reasonably interpreted as describing items that were already in production. Again, these instances of the use of the term "NDI" do not meet the strict definition of NDI in the FAR.

Documents created by defendant prior to formally soliciting bids on the DASR solicitation also reflect this imprecise, general use of the term. When defendant concluded its market survey, it stated that Raytheon and Northrop's respective systems were NDI precisely because they had previously-developed, in-production radar systems,[31] and not because they met or could meet solicitation requirements (which, incidently, were not finalized at the time the survey was completed; strict FAR-provision-based NDI status could therefore not be determined at that time). In contrast, the survey results stated that Siemens Plessy, which did not make a proposal for the DASR contract, did not have an NDI system precisely because the radar had not yet been created.[32] It is logical to conclude that an NDI radar, for the purposes of this solicitation, meant merely an existing radar to Northrop, Raytheon, and defendant alike.

While this widespread usage of a relaxed definition for NDI does not conflict with the strict definition of the term located in the FAR, it certainly poses problems for plaintiffs' insistence that NDI is defined solely by the FAR's strict definition. The FAR's definition, as a crucial part of an overall NDI requirement in the contract, would severely limit defendant's ability to make changes to the DASR system contract. It is not reasonable, however, to impose such a limitation on the DASR solicitation, and therefore transitively on defendant, when it is clear that the parties did not understand the strict

27. AR at 533(RTP).

28. AR at 550, 556, 581(RTP), 889 (RTP, Attachment 3).

29. AR at 4210, 4226, 4281 (Northrop Grumman Proposal—Solid State, Volume I, Technical Proposal), 4987 (Northrop Grumman Proposal—Solid State, Volume III, Cost Proposal (NCP)).

30. AR at 4975(NCP).

31. AR at 10,480, 10,504 (ASR–11 Market Survey Wrap-Up Meeting dated 23 Jun 94 (Survey Wrap-Up)), 10,608 (Raytheon Site Visit—Out Briefing).

32. AR at 10,513 (Survey Wrap-Up).

FAR definition to be the operative definition in the solicitation. This is especially true when, despite the obvious general usage of the term in the solicitation and the bidders' proposals, there is no sign in the record of a conscious application of the FAR definition to the proposed systems vis-à-vis the system specifications of the solicitation. While plaintiffs have argued that Raytheon and defendant simply did not understand the term "NDI" at all, the above-cited excerpts from Northrop's proposal show that Northrop was using the same skewed definition of the term. Because the parties' use of the term did not comport with the FAR definition of NDI, the court will not place such a requirement in the solicitation.

The court will nonetheless examine whether or not there is an NDI requirement, assuming that the FAR definition of the term "NDI" applies in this case. As mentioned above, the mere inclusion of the FAR definition of NDI does not amount to a solicitation requirement. Plaintiffs state, however, that the definition read in conjunction with various other provisions in the solicitation that use the term "NDI" show clearly that there was an NDI requirement in this case. Defendant and Raytheon claim instead that the solicitation language evinced only a strategy of NDI acquisition to the maximum extent practicable. They argue that many sections of the solicitation allow for a degree of change and flexibility of performance that make a finding of the existence of an NDI requirement unreasonable.

Plaintiffs rely on a decision by the General Services Administration Board of Contract Appeals (GSBCA), *Trimble Navigation, Ltd.*, Comp. Gen. Dec. B–271,882 (26 Aug. 1996), 96–2 CPD ¶ 102, 1996 WL 511438, to assert that the government may be bound by an NDI requirement when one exists in a solicitation. In that case, GSBCA held that when a clear NDI requirement exists in a solicitation, the government is bound to consider it and may not treat the term "NDI" as generic. Plaintiffs therefore state that many of the changes are outside the scope of the

competition in this case, because the changes fall outside the strictures of the alleged overarching NDI requirement. While the holding in *Trimble* is persuasive, the case itself provides the court with little guidance to aid the determination of whether an NDI requirement exists in the solicitation at issue here. In *Trimble*, GSBCA did not have to answer this question, because the "statement of work (SOW) [in the solicitation] provided that the [product] must be an NDI," and the government admitted that an NDI requirement existed. *Id.* at 2. Indeed, there is little pertinent case law that touches on the determination of NDI as a requirement in a solicitation or contract.

Inspection of the solicitation shows that it did contain many references to the intended NDI nature of the DASR systems defendant had procured. Each of these references consisted, at least in part, of language describing the DASR system as an "NDI system." The cover letter for the solicitation stated that the DASR program was instituted for the purpose of acquiring "up to 213 Non-developmental Item (NDI) radars," and that "[a]n Operational Capability Demonstration (OCD) [would be] conducted to verify that the offeror has a functional, NDI system."[33] The SRD established "the functional requirements for a non-developmental item (NDI) S–Band unmanned airport surveillance radar (ASR) designated as the Digital Airport Surveillance Radar (DASR)."[34] The OCD Guidance document explained that one of the objectives of the OCD was to "[d]emonstrate [that] the Offeror's NDI product [was] representative of the DASR proposed in the technical proposal."[35] At first glance, these provisions, coupled with the incorporated FAR definition of NDI, seem to at least suggest an NDI requirement existent in the solicitation.

Nevertheless, many provisions in the contract cast doubt on an interpretation of the solicitation in which a central, overriding requirement for NDI radars under the strict FAR definition exists. First, the solicitation includes the general changes clause of the FAR, a central provision that grants govern-

---

33. RFP Cover Letter.

34. AR at 291 (DASR Solicitation).

35. AR at 439 (DASR Solicitation).

ment agencies a wide berth in allowing changes to contracts in order to fulfill governmental needs. 48 C.F.R. § 52.243–1 (2000) (Changes—Fixed Price); 48 C.F.R. § 52.243–2 (2000) (Changes—Cost Reimbursement).[36] The solicitation also recited the verbatim language of FAR sections that allow and encourage technological advances and substitute products when existing products to be provided under a contract or solicitation become outdated or obsolete. These clauses by their terms alone would permit changes outside the restrictions of the FAR definition of NDI. Plaintiffs argue, however, that they should simply be read together with the supposed NDI requirement, thus creating a modified set of clauses that facilitate needed alteration to the contract so long as it is minor in scope under the NDI definition. Plaintiffs, however, presuppose the existence of the requirement: the very inclusion of these clauses calls into question whether any such requirement is contained in the solicitation. Nothing in the solicitation specifically or directly restricts the application of the three clauses mentioned above. In other places in the solicitation, such as the "Order of Precedence" clause, specific FAR provisions are altered to accord with the particular goals and requirements of this procurement.[37] The fact that the solicitation makes no effort to curtail these clauses when their effect could prove so detrimental to or conflict with any NDI requirement, and because such restriction of these clauses would not have been difficult to perform, the court hesitates to attribute such a requirement to the contract.

An investigation of more specific language in the solicitation also makes a strict, FAR-definition NDI requirement unlikely. First, the solicitation did not list NDI as a "shall" (meaning mandatory) characteristic. Such inclusion in the list of "shalls" would have made it clear to bidders that NDI was not to be viewed as anything less than a requirement. The fact that NDI is not listed as a "shall" in the solicitation does not necessarily end the possibility of the existence of an NDI requirement. Nonetheless, the absence of an NDI requirement in the list of "shalls" is notable. Furthermore, nowhere in this list of requirements does the solicitation infuse another "shall" with an NDI requirement, in substance or detectable principle.

Second, the proposed method in the solicitation employed in testing the radar systems of the respective bidders to determine their compliance with the solicitation's requirements suggests a general flexibility that stresses outcome (i.e., a final product that provides the performance specifications of the DASR system solicitation) over a given approach, such as NDI, to achieving such an outcome. Although the OCD was "conducted to verify that the offeror ha[d] a functional, NDI system,"[38] and therefore presumably meant to require compliance with the definition of NDI, results of the OCD were not rated in terms of mandatory requirements. Instead, the results of the testing were merely "factored into the technical evaluation results and technical risk." "The extent of necessary modifications will also be considered in assessing the technical risk(s) associated with the proposal."[39] In the OCD Guidance document, the solicitation states that the "OCD will not be considered a 'pass/fail' element of the source selection."[40] The solicitation also includes a statement that explains, "OCD results which establish that the demonstrated equipment fails to satisfy the SRD will be considered deficiencies unless the Offeror's written proposal offers a modification which will satisfy SRD requirements."[41] Thus, although modifications would have to be minor to comport with an NDI requirement if one existed, here in the solicitation the term "modification" is not

---

36. Although the changes clause is standard fare in government contracts, and as such does not provide direct proof that the parties did not intend to incorporate an NDI requirement into the contract, it is nonetheless important to consider the effect of possible restriction on the importance of the changes clause by another federal regulation such as the NDI definition.

37. AR at 217 (DASR Solicitation).

38. RFP Cover Letter.

39. AR at 266–67 (DASR Solicitation)

40. AR at 439 (DASR Solicitation).

41. AR at 266 (DASR Solicitation).

altered by any substantive restriction imposed by a requirement for NDI, nor is NDI invoked in name. Again, while the precedence and general importance of the NDI nature of the DASR system is apparent in the solicitation language, the provisions that surround such language show only a preference, rather than a requirement, for NDI systems.

Perhaps the most important problem hindering a finding of an NDI requirement in the solicitation is the absence of clearly articulated requirements that are separable from or add definition to the mandated FAR NDI definition and the conclusory invocations of the term "NDI" discussed above. Almost nothing in the solicitation explains what the definition of NDI is as applied to this particular procurement. As was explained previously, "NDI" as a term is a general one when standing alone, replete with parameters for application but devoid of specifics that would explain to would-be bidders what they must produce to meet the particular definition of NDI in a given procurement. Although a government agency and the bidders involved in a solicitation and competition may all have the same general idea of what constitutes an NDI in that unique situation, the solicitation itself must delineate the elements that will make a product NDI in order for the court to find the existence of an NDI requirement. Otherwise, the court faces an eventuality in which it will be required to enforce a requirement that no party could properly define, and therefore with which no party could reasonably be expected to comply. *See Harris Corp.*, Comp. Gen. Dec. B–235,126 (8 Aug. 1989), 89–2 CPD ¶ 113, 1989 WL 240982. It is incumbent upon all interested parties to a solicitation to consciously and cautiously define both the meaning of NDI within every solicitation, and to make certain that the solicitation clearly makes NDI an absolute

requirement. In this case, because the solicitation was severely passive in its treatment of NDI, neglecting to include any meaningful explanation of its importance or of its particular definition within the solicitation, the court will not now bestow upon the term a presence and preeminence that it never possessed.[42]

### 2. Changes Made Outside Scope

 It is left for the court to determine whether the modifications and other changes that have occurred during the performance of the contract amount to a cardinal change. Plaintiffs have alleged that defendant has relaxed and waived a number of contract requirements in this case, and as a result, has violated the CICA. 10 U.S.C. § 2304(a)(1)(A) (1994). Thus, plaintiffs do not allege arbitrary and capricious conduct by defendant, but instead assert that defendant has failed to act in accordance with applicable law. *CCL*, 39 Fed.Cl. at 791 ("The agency's application of the law is not viewed through the prism of [the arbitrary and capricious standard] .... If the action was prejudicially unlawful, it does not matter that the agency's perception that its conduct was lawful is reasonable." (footnote omitted)). The CICA states that "the head of an agency in conducting a procurement for property or services ... shall obtain full and open competition through the use of competitive procedures ...." § 2304(a)(1)(A). The CICA's requirements "cannot be avoided by using the device of contract modification." *CCL*, 39 Fed.Cl. at 791. If the government procures services through competition, but then changes the contract work being performed by the contract awardee, such changes may effectively circumvent the competition requirements of the CICA. *Wiltel*, 1 F.3d at 1205. "CICA, however, does not prevent

---

**42.** This finding is in accord with the overall intent of the provisions of the FASA. While the FASA certainly promotes the use of commercial items and NDI in government contracts, the statute at no time requires acquisition of NDI products. *See* 41 U.S.C. § 264b(b); 48 C.F.R. § 2.201; *see also* 48 C.F.R. § 10.001 (2000) (market research for possible NDI acquisition required). Indeed, the legislative history of the FASA makes apparent that the statute was meant to aid the government in its procurement of

goods and services, not to limit its ability to obtain such goods and services. S. Rep. No. 103–258, at 1–2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2562. The FASA contemplates situations in which NDI may be a requirement. *See* 41 U.S.C. § 264b(a), (b). Given the lack of a mandate in the FASA for an NDI requirement in government contracts, however, the parties must show clear specific intent in the unique provisions of each procurement in order for the court to find an NDI requirement.

modification of a contract by requiring a new bid procedure for every change. Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement." *Id.* (footnote omitted).[43]

The Federal Circuit has adopted the classic doctrine of "cardinal change," cultivated by the Court of Claims, as the standard for determining whether a contract modification runs afoul of the competition requirements of the CICA. The Court of Claims described the doctrine:

> Under established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then, a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

*Allied Materials & Equip. Co. v. United States,* 215 Ct.Cl. 406, 409, 569 F.2d 562 (1978), *quoted in Wiltel,* 1 F.3d at 1205; *see also Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 408 F.2d 1030 (1969). The cases that developed the cardinal change doctrine, however, were different from this case. Here, instead of determining whether the government has breached a contract, entitling a plaintiff-awardee to damages or other relief, the court must decide "whether Government modifications changed the contract enough to circumvent the statutory requirement of competition. The cardinal change doctrine asks whether a modification exceeds the scope of the contract's changes clause; this case asks whether the modification is within the scope of the competition conducted to achieve the original contract." *Wiltel,* 1 F.3d at 1205. Thus, the courts have created two tests when considering the cardinal change doctrine: (1) when the dispute is between the contractor and the government, the court looks to whether the change was within the "scope of the contract"; (2) when the dispute originated within a third-party competitor protest, as in this case, the court will decide whether the change was within the "scope of the competition." *See* JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 384, 388 (3d ed.1995).

"CICA sets forth no standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement." *Wiltel,* 1 F.3d at 1205. The question the Federal Circuit has undertaken, therefore, is whether a contract as modified has materially departed from the scope of that contract as originally procured. *Id.* "[A] broad original competition may validate a broader range of later modifications without further bid procedures." *Id.; see Phoenix Air,* 46 Fed.Cl. at 105–06 (holding a task order for expanded flight services for the Navy was within the scope because the contract was to cover services "worldwide"); *Astronautics Corp. of Am.,* Comp. Gen. Dec. B–242,782 (5 June 1991), 91–1 CPD ¶ 531, 1991 WL 123527. When the court finds, applying an objective standard, that potential bidders would have expected a modification to fall within the changes clause of the contract, such a modification will be found to be within the scope of the original procurement. *Id.; CCL,* 39 Fed.Cl. at 791; *Phoenix Air,* 46 Fed.Cl. at 104. If a modification is found to be outside the reasonable expectations of the bidders, the government must show that it adequately advised the bidders that such a change might occur. *Id.* at 1207. The court's analysis takes the entire original procurement into account when comparing its scope to the scope of the modified contract. *Id.* at 1205; *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 194, 351 F.2d 956 (1965) ("Each case must be ... giv[en] just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole."). Cardinal change analysis is primarily a fact-based question, and therefore each case is considered individually on the totality of its unique circumstances. *Green Mgmt. Corp. v. United States,* 42 Fed.Cl. 411, 430 (1998).

---

**43.** Case law and statutory authority ensure the right of the government to modify its procurement contracts at any time. *See Wiltel,* 1 F.3d at 1205 n. 1; *Green Mgmt. Corp. v. United States,* 42 Fed.Cl. 411, 429 (1998).

■ Various overlapping tests have been applied to the myriad factual situations in cardinal change cases. Factors important to the cardinal change analysis include modifications to the type of product or service being delivered or performed, the quantity of the product or service, the performance period, and the cost between the solicitation as competed and the contract as modified. *See Neil R. Gross & Co.,* Comp. Gen. Dec. B–237,434 (23 Feb. 1990), 90–1 CPD ¶ 212, at 2–3, 1990 WL 269546, *aff'd on reconsideration,* Comp. Gen. Dec. B–237,434.2 (22 May 1990), 90–1 CPD ¶ 491, 1990 WL 278059, *cited with approval in Wiltel,* 1 F.3d at 1205. Changes in the type of product or service that were not anticipated due to their lack of resemblance to the original procurement are usually found to be outside the scope of the procurement. *See Am. Air Filter Co.,* Comp. Gen. Dec. B–188,408 (19 June 1978), 78–1 CPD ¶ 443, 1978 WL 13484 (substitution of diesel for gasoline engines resulting in development work, increased time and price found outside scope of competition); *Stoehner Sec. Servs., Inc.,* Comp. Gen. Dec. B–248,077.3 (27 Oct. 1992), 92–2 CPD ¶ 285, 1992 WL 314694 (substitution of more highly trained personnel outside scope); *but see Everpure, Inc.,* Comp. Gen. Dec. B–226,395.4 (10 Oct. 1990), 90–2 CPD ¶ 275, 1990 WL 278656 (change in technical approach in a research and development contract within scope). Significant addition or subtraction of the quantity of work can also be outside the scope. *See PAI Corp.,* Comp. Gen. Dec. B–244,287 (29 Nov. 1991), 91–2 CPD ¶ 508, 1991 WL 270355. Additional time spent on performance of a contract is within the scope when it is due to problems with the completion of performance, but not when such time is extended in order to add significantly more quantity or new requirements to the contract. *Compare Saratoga Indus., Inc.,* Comp. Gen. Dec. B–247,141 (27 Apr. 1992), 92–1 CPD ¶ 397, 1992 WL 94774 (additional time to correct errors in design held within scope), *with CPT Corp.,* Comp. Gen. Dec. B–211,464 (7 June 1984), 84–1 CPD ¶ 606, 1984 WL 46202 (time added for completion of new added work and new requirements outside scope).

Whether bidders would have anticipated changes in each of these areas of contract performance depends heavily on the language of the solicitation. CIBINIC & NASH, *supra,* at 389. Changes consisting of technological upgrades have been repeatedly held to be within the scope of the original solicitation where the solicitation included language that expressly anticipated and encouraged the utilization of such advances. *See Wiltel,* 1 F.3d at 1206; *MCI Telecomms. Corp.,* GSBCA No. 10540–P (28 Feb. 1990), 90–2 B.C.A. (CCH) ¶ 22,735, 1990 WL 18930. Major changes in the amount of work will be held to be within the scope of a procurement when the bidders were warned of the possibility during the solicitation. *Nat'l Data Corp.,* Comp. Gen. Dec. B–207,340 (13 Sep. 1982), 82–2 CPD ¶ 222, 1982 WL 27291. On the other hand, when a solicitation expressly prohibits certain types of modification, such a modification, when it occurs, is outside the scope of the solicitation and a new procurement is required by the CICA. *Avtron Mfg., Inc.,* Comp. Gen. Dec. B–229,972 (16 May 1988), 88–1 CPD ¶ 458, 1988 WL 222812. Also, when contract language requires very specific products or services, and bids for the contract were keyed primarily to those requirements, changing such requirements after contract award will be deemed outside the scope, even if such a change does not significantly alter the work being performed. *See Webcraft Packaging, Div. of Beatrice Foods Co.,* Comp. Gen. Dec. B–194,087 (14 Aug. 1979), 79–2 CPD ¶ 120, 1979 WL 12167 (change in brightness of paper from very rare type to more common type deemed outside scope); *Marvin J. Perry & Assocs.,* Comp. Gen. Dec. B–277,684 (4 Nov. 1997), 97–2 CPD ¶ 128, 1997 WL 687158 (use of ash wood instead of oak outside scope). When the government knows it will have to modify the specific language and requirements of a contract before the award is made, or when the government simply fails to consider stated requirements in a contract so that changes will be inevitable after award, such changes will be held outside the scope of the competition and the contract will be considered void *ab initio. See Midland Maint., Inc.,* Comp. Gen. Dec. B–184,247 (5 Aug. 1976), 76–2 CPD ¶ 127, 1976 WL 9908; *Trimble,* 96–2 CPD ¶ 102, 1996 WL 511438 (government's failure to consider NDI re-

quirement leads to an award to contractor without an NDI solution).

In this case, plaintiffs argue that a cardinal change has occurred that is outside the scope of the original competition for the DASR systems contract, but its challenge differs greatly from most bid protest cases in which cardinal change is alleged. Usually, a disappointed bidder challenges a change to a contract when that change calls for a new service or product, *e.g., Wiltel,* 1 F.3d 1201 (new telecommunications service added to a contract); *Phoenix Air,* 46 Fed.Cl. 90 (multiple new air travel routes added to a transportation contract); *CCL,* 39 Fed.Cl. 780 (contract for services at six locations extended to 16 locations), or when the product originally procured has been completely replaced by another for the same purpose under the contract, *Am. Air Filter,* 78–1 CPD ¶ 443, 1978 WL 13484. Here, the facts do not show that a new product beside the DASR has been improperly procured, nor that Raytheon's proposed DASR has been supplanted in whole or significant part by a completely different system. Instead, plaintiffs rely substantially on the dozens of problems that have surfaced during the testing of Raytheon's system and the performance of the DASR contract, arguing that defendant and Raytheon's attempts to cure those problems are outside the scope of the original solicitation. These arguments bring the court perilously close to engaging in outright contract administration. It is within the prerogative of the parties to make continuous efforts to comply with the requirements of a solicitation and contract when problems arise. *See Harris,* 89–2 CPD ¶ 113, 1989 WL 240982.

 The court will look to the specific modifications to the contract to determine whether they were within the scope of the original competition for the DASR contract.

First, plaintiffs allege that defendant has been forced to allow massive schedule slippage on the contract, as well as critical deviations from the original progression of production of the DASR systems. In general, extensions of the time period for performance of a contract do not amount to actions outside the scope of a competition, unless time is the critical element in defining the obligation of the government contract (e.g., a contract for a service for a specific period of time). *See Def. Sys. Group,* B–240,295 (6 Nov. 1990), 1990 WL 293536; CIBINIC & NASH, *supra* at 390. Here, Raytheon admits sizeable delays and attempts to explain them with factors largely outside Raytheon's own control. Most important, however, is the fact that Raytheon and defendant are working on solutions to the performance difficulties, and that the delays are a direct result of those problems that were not anticipated by the parties. While there was a window of ten years to complete the contract, this specific time period was not crucial to Raytheon's obligations pursuant to the solicitation or the contract.[44] The court will not punish Raytheon and defendant for causing delays by attempting to complete the contract requirements in the face of adversity. Any reasonable bidder would expect to engage in the same efforts. Those efforts are not outside the scope of the contract.

 Plaintiffs also state that there were 32 modifications to the contract identified within the first year of performance. Plaintiffs attack five of these modifications as being outside the scope of the competition because they are "major" modifications. Raytheon's development of a new PSR transmitter is an example of one of said modifications. In addition, plaintiffs challenge proposed waivers of requirements under the DASR solicitation and contract.[45] They al-

**44.** Lockheed also states that further testing of Raytheon's system during the performance of the contract, as well as the early authorization of LRIP, are outside the scope of the competition. It is difficult to understand how these changes, while perhaps not to be specifically anticipated by the reasonable bidder on the solicitation, somehow expand the scope of the competition such that a new solicitation is necessary. In terms of the product being delivered, and the work expected of Raytheon, there is no change effected by these testing and production decisions.

**45.** Various waivers of contract requirements and ECPs have been proposed by Raytheon, but only those changes that have been implemented can be properly reviewed for a scope determination by the court. *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 782–83 (1997) (explaining that the court will not substitute its judgment for that of a government agency in contract administra-

lege that Raytheon has received improper aid from Lincoln, and that software builds on the project have escalated to a point that the solicitation and contract did not contemplate. Although these changes represent important aspects of the procurement, the standard under which the court makes its decision is whether the reasonable bidder would have expected that the change could occur. In this case, what plaintiffs challenge as changes outside the scope are simply continuing efforts to bring Raytheon's DASR system up to the specifications of the solicitation and contract. The changes do not represent the addition of new products or services to those originally competed under the solicitation, nor do they add to the obligation of Raytheon in any way. They do not fundamentally change the physical or performance aspects of Raytheon's DASR system. The reasonable bidder expects to be held to its promise to provide the government with the benefit of its bargain and to work with the government until that promise is fulfilled. These modifications and changes to the contract, therefore, do not fall outside the solicitation; no cardinal change outside the scope of the original competition for the DASR system contract occurred in this case. The authorization of LRIP through Delivery Orders 0019 and 0024 is justified and proper.

## B. Misrepresentation

■■■ Northrop also alleges that Raytheon made material misstatements in its bid proposal for the contract, and therefore the contract award should be dissolved and a reprocurement should take place. A bidder to a government contract who makes material misstatements in its proposal taints the award to such a bidder. Misrepresentations in bid proposals prevent government officials from determining the best value to the government and retard the competitive bidding process. When a bidder is found to have misrepresented its ability to perform a contract, that bidder will lose its right to execute the solicited work or bid on the reprocurement of the contract. As the Federal Circuit has held,

> the submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal. The integrity of the system demands no less. Any further consideration of the proposal in these circumstances would provoke suspicion and mistrust and reduce confidence in the competitive procurement system.

*Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed.Cir.1992) (quoting *Informatics, Inc.*, Comp. Gen. Dec. B–188,-566 (20 Jan. 1978), 78–1 CPD ¶ 53 at 9, 1978 WL 13361); *see also Impresa*, 238 F.3d at 1339. The bidder must intend to make the misstatement. Proof of intent may come from circumstantial evidence. *Planning Research*, 971 F.2d at 742.

■■■ Although Raytheon has had difficulty performing the contract, and many shortcomings have been found in its DASR system, these facts do not amount to Raytheon's having defrauded defendant in any way. Indeed, while defendant has expressed dismay over the problems and delays during the performance of the contract, it has also stated that it would do business with Raytheon again on similar projects. No one within the Air Force or FAA, and no one in the DASR Program Office has expressed or even intimated that Raytheon made its proposal in bad faith or with disregard for the truth. Indeed, it is quite common for proposals to fall short of their assertions; it is not something to be punished unless the errors were willful and egregious. From all accounts, Raytheon and defendant have worked through the difficulties they have encountered. Without

---

tion matters such as whether to allow a change to a contract). Raytheon argues that the only changes the court should consider are those directly ordered by the government, *see Wiltel*, 1 F.3d at 1205, and that changes made by Raytheon on its own should not be reviewed, because the court's jurisdiction extends only to review of agency action. 28 U.S.C. § 1491(b); 5 U.S.C. § 706. While Raytheon's argument is

correct *prima facie*, if in all cardinal change cases the court were to limit its review solely to those changes officially ordered by the government in accordance with formal change procedure, the government could avoid the statutory requirements for competition simply by making all changes informally. The court will therefore review any change made on a contract that has been sanctioned or condoned by the government.

some proof that Raytheon's actions in preparing its proposal were sinister, not just deficient or overestimated, Northrop's claim that Raytheon wrongfully misrepresented its ability to perform the contract fails.

In addition, unlike cases in which a bidder has made representations that cannot be verified by the government until after award, *see generally id.,* in this case defendant had ample opportunity to see for itself whether Raytheon had misrepresented its DASR system's abilities. Even the previous testing results that defendant relied upon from Raytheon could at least be fundamentally verified by the pre-award testing. Also, the alleged misstatements concerned performance on the contract that was to be continuously monitored throughout the contract's schedule. The fact that problems have surfaced does not necessarily point to a misrepresentation, although it is a possible explanation of the original deficiencies in Raytheon's DASR product. Nonetheless, Northrop would need to provide additional evidence of wrongdoing before the court could infer misrepresentation. As with the NDI requirement argument, Northrop's claim of misrepresentation relies too heavily on the number of problems that have been encountered. Northrop has failed to break through the presumption that difficulties in contract performance are matters of administration best left to the procuring agency. For that reason, the court will leave such administration matters to the Air Force and FAA in this case.

### Conclusion

For the above-stated reasons, the solicitation in this case contained no mandatory requirement for delivery of NDI systems. The contract language does not meet the specificity needed for the court to find so restrictive a limitation on defendant's ability to meet the product goals of its procurement. Because no NDI requirement existed, and because all of the parties to this action treated the term "NDI" as having a broader meaning than that contained in the FAR, the court finds that the changes defendant has made to the DASR contract during performance do not significantly alter the parties'

responsibilities. Thus defendant has not violated the CICA by commanding work by Raytheon that is outside the scope of the competition for the DASR contract.

In addition, the court finds that Raytheon did not misstate material facts to defendant in its bid proposal for award of the DASR contract. Nothing in the record shows that the problems in performance are a result of a conscious effort by Raytheon to defraud the government. Because the court finds no tainting of the procurement process, Northrop's claim is rejected.

Both Northrop's and Lockheed's motions for judgment on the administrative record are hereby DENIED. Defendant's and Raytheon's motions for judgment on the administrative record are hereby GRANTED. The Clerk is directed to dismiss Northrop's complaint, No. 00–306C, and Lockheed's complaint, No. 00–367C. No costs.

IT IS SO ORDERED.